Najia RAHMANI, Plaintiff,

v.

RESORTS INTERNATIONAL HOTEL, INC., et al., Defendants.

No. CIV. A. 98–205–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 8, 1998.

Barry Coburn, Coburn & Schertler, Washington, DC, for Plaintiff.

Hugh P. Quinn, Rosenman & Colin, LLP, Washington, DC, Daniel Schiffman, Schiffman & Frank, New York City, for Resorts International Hotel, Inc.

Michael J. Klisch, Robert T. Cahill, McGuire, Woods, Battle & Boothe LLP, McLean, VA, for Boardwalk Regency Corporation.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this unusual diversity case, a Virginia plaintiff hopes to use her home state's laws against gambling to help her recover from New Jersey casinos the large gambling losses she incurred there. Plaintiff Najia Rahmani alleges that defendants Boardwalk Regency Corporation ("Boardwalk") and Resorts International Hotel, Inc. ("Resorts") induced her to travel to New Jersey and squander her money in their casinos. She further alleges that her acceptance of such inducements created a contract between the parties, but that these contracts were void as a matter of Virginia law. She therefore seeks restitution of all monies she has lost gambling in defendants' New Jersey casinos over the past thirteen years. For the reasons that follow, plaintiff's effort fails; the law sensibly affords no remedy in these circumstances.

### I.[1]

Rahmani is a Virginia citizen, while defendants Resorts and Boardwalk are New Jersey corporations that own and operate gambling casinos. Resorts owns and operates Resorts International Casino, in Atlantic City, New Jersey, while Boardwalk owns and operates Caesars, another gambling establishment in Atlantic City, New Jersey.

Rahmani's first experience with casino gambling occurred in 1984 when she visited Resorts. During that visit, Resorts employees noticed that Rahmani lost a considerable sum of money, and that she appeared to be a wealthy woman. As a result of these observations, Resorts repeatedly contacted Rahmani in Virginia over the course of the next thirteen years and induced her to return to

---

1. At the 12(b)(6) stage, the allegations as pled in the complaint are taken as true. *See Martin Marietta Corp. v. International Telecom. Satellite Org.,* 991 F.2d 94, 97 (4th Cir.1992) (citing *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969)).

Atlantic City to gamble. Boardwalk became aware of Rahmani's gambling habits in 1990, and it, too, began to encourage her to visit Atlantic City. Specifically, Resorts and Boardwalk called Rahmani and sent her letters, promising that if she agreed to come to the casino to gamble, Resorts or Boardwalk would send limousines to transport her and her friends and family to New Jersey, where she would be provided free hotel accommodations, meals and entertainment. These solicitations, which continued through November 1997, largely succeeded, for according to Rahmani, soon after her introduction to casino gambling in 1984, she became addicted to the activity, i.e., she became a compulsive gambler. She claims that both Resorts and Boardwalk knew or should have known of her condition, but nonetheless continued to induce her to travel to Atlantic City to gamble. Over approximately a thirteen year period, Rahmani claims to have lost over $3.8 million while gambling at Resorts and Caesars.

Rahmani filed suit on February 11, 1998, arguing that her agreements with Resorts and Boardwalk were void under Virginia law and seeking rescission of the contracts and restitution of the money she gambled and lost at the casinos over the thirteen-year period. She alleged other state law claims as well, including negligence and "unlawful harassment." On April 4, 1998, Boardwalk's Motion to Dismiss was granted; on July 17, 1998, Resorts' Motion to Dismiss was granted, and Counts I, II, III, V, and VI were dismissed with prejudice in their entirety. Count IV, a forgery claim, was dismissed without prejudice to allow Rahmani leave to amend her Complaint solely on this count, as requested by Rahmani's counsel. This memorandum opinion sets forth the reasons for the dismissals.

## II.

As this is a diversity case, Virginia's choice-of-law rules govern. *See Klaxon*

Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In this regard, Virginia adheres to the traditional First Restatement rule for contracts cases, namely that the laws of the place of contracting govern the validity of a contract. *See Fuisz v. Selective Ins. Co.*, 61 F.3d 238, 241 (4th Cir.1995) (applying Virginia law); *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423, 426–27, 177 S.E.2d 610, 613–14 (1970). Under the traditional First Restatement rule, the place of contracting is determined by the location of the last act necessary to complete the contract. *See Keco Indus., Inc. v. ACF Indus., Inc.*, 316 F.2d 513, 514 (4th Cir.1963) (citing Restatement, Conflict of Laws, § 326 (1934)). The threshold inquiry, therefore, is where the last act necessary to complete the contracts occurred, and thus where the contracts between Rahmani and the defendants were formed.

To determine where the last act necessary to complete the contracts occurred, it is important to identify with some precision just what the contracts were. In this regard, Rahmani alleges that the contracts consisted of the defendants' promise of limousines and free accommodations (the offer) and her agreement to travel to Atlantic City to enjoy these amenities and gamble (the acceptance).[2] Accordingly, under Rahmani's theory, the last act necessary to form the contracts, namely Rahmani's acceptance of the offers, occurred in Virginia. Thus, Rahmani argues, Virginia law should apply.

Boardwalk and Resorts counter by arguing that common sense suggests that the contracts were formed not in Virginia, but in New Jersey when Rahmani placed her bets at the casino gambling table. Resorts attacks Rahmani's characterization of the contracts on the ground that such contracts could not have been enforced under Virginia law for they would lack the mutuality required for formation of a valid contract in Virginia.[3] Thus, if after arriving in Atlantic

---

2. Mutual promises in Virginia are sufficient consideration to support the formation of a contract. *See Adams, Payne & Gleaves v. Indiana Wood Preserving Co.*, 155 Va. 18, 29, 154 S.E. 558, 562 (1930).

3. *See, e.g. Piland Corporation v. REA Construction Co.*, 672 F.Supp. 244, 247–48 (E.D.Va.1987) ("In Virginia, and generally, the rule of contract law is that there must be absolute mutuality of engagement so that each party is bound and has the right to hold the other party to the agree-

City and enjoying Resorts' hospitality, Rahmani had decided not to gamble, Resorts would not have been able to enforce such a contract under Virginia law. Both defendants argue that the only contracts between the casinos and Rahmani arose when Rahmani placed her bets at the casino gambling tables in New Jersey, and thus New Jersey law governs.

■ Although not free from doubt, the argument for application of New Jersey law is more persuasive. No mutually enforceable obligations were created until Rahmani placed a bet at a New Jersey gambling table.

■ Given that New Jersey law governs, Rahmani's claims for rescission and restitution plainly fail. In New Jersey, "[c]asino gambling has been legal ... since 1977, and the casino industry is purely a creature of statute." *Hakimoglu v. Trump Taj Mahal Assoc.*, 876 F.Supp. 625, 633 (D.N.J.1994), *aff'd* 70 F.3d 291 (3d Cir.1995). New Jersey's casino industry is governed exclusively by New Jersey's Casino Control Act, N.J.S.A. §§ 5:12–1 to –210 (1997) ("CCA"), which provides a "regulatory scheme [that] is both comprehensive and minutely elaborate." *Knight v. City of Margate*, 86 N.J. 374, 431 A.2d 833 (1981); *Hakimoglu*, 876 F.Supp. at 631. The Casino Control Commission establishes the rules governing the operation of casinos, including setting the odds for each game, odds that always favor the casino. *See Tose v. Greate Bay Hotel & Casino Inc.*, 819 F.Supp. 1312, 1319 (D.N.J.1993). More important ly, the CCA specifically "permits casi nos to offer free food, lodging, transportation and other inducements to potential customers" as part of "junkets" that casinos may offer to their patrons. *See Tose*, 819 F.Supp. at 1320 n. 11 (describing a junket as the provision of "complimentary transportation, food, lodging and entertainment based on [a] person's propensity to gamble").

Under New Jersey law, therefore, the casino gambling contracts are valid. Not only does the CCA legalize casino gambling generally, it specifically recognizes and authorizes the very activity Rahmani complains of, namely the practice of offering junkets to people with a propensity to gamble for the purpose of encouraging them to travel to New Jersey to do so. *See* N.J.S.A. 5:12–29 and 5:12–102 (defining junkets and setting forth conditions for junkets).[4] Accordingly, under New Jersey law, the contracts are valid and enforceable, and thus Rahmani cannot sue for their rescission or for restitution.

### III.

■ Given the closeness of the choice of law issue, it is worth noting that Rahmani fares no better under Virginia law. To begin with, it is readily apparent that Virginia affords Rahmani no contract remedies. If, as Rahmani asserts, the last act necessary to the contract occurred in Virginia, the contract created, putting aside the absence of mutuality, would be deemed a gambling contract under Virginia law.[5] Such a contract, of course, is void under Virginia law;[6] it is

ment."); *see also Smokeless Fuel Co. v. W .E. Seaton & Sons*, 105 Va. 170, 52 S.E. 829, 830 (1906) ("The general rule of law is that, where the consideration for the promise of one party is the promise of the other party, there must be absolute mutuality of engagement, so that each party has the right to hold the other to a positive agreement.").

4. New Jersey law defines a junket as "[a]n arrangement the purpose of which is to induce any person selected or approved for participation therein on the basis of his ability to satisfy a financial obligation related to his ability or willingness to gamble or on any other basis related to his propensity to gamble, to come to a licensed casino hotel for the purpose of gambling, and pursuant to which, and as consideration for which, any or all of the cost of transportation, food, lodging, and entertainment for said person

is directly or indirectly paid by a casino licensee or employee or agent thereof." N.J.S.A. § 5:12–29.

5. *See Hughes v. Cole*, 251 Va. 3, 13, 465 S.E.2d 820, 827 (1996) (holding contract based on mutual promises to share proceeds of lottery is a gambling contract under Virginia law).

6. "All wagers, conveyances, assurances, and all contracts and securities whereof the whole or any part of the consideration be money or other valuable thing won, laid, or bet, at any game, horse race, sport or pastime ... shall be utterly void." Va.Code § 11–14; *see also Kennedy v. Annandale Boys Club, Inc.*, 221 Va. 504, 506, 272 S.E.2d 38, 39 (1980) (holding that § 11–14 rendered a gaming contract a complete nullity with no legal force or binding effect); *Resorts Int'l Hotel, Inc. v. Agresta*, 569 F.Supp. 24, 26

"a complete nullity, one that has no legal force or binding effect." *Kennedy*, 272 S.E.2d at 39. Further, "[i]t is one which never had any legal existence or effect, and one which cannot in any manner have life breathed into it." *Id.* As gambling contracts are illegal or immoral contracts in Virginia, "[Virginia] law simply leaves the litigants in the plight in which they have seen fit to place themselves without undertaking to balance benefits or burdens." *Phillip Levy & Co. v. Davis*, 115 Va. 814, 80 S.E. 791, 792 (Va.1914) ("[T]he law...will neither lend its aid to enforce [the illegal or immoral] contract while executory nor to rescind it and recover the consideration parted with when executed."). *See also Higgins v. McCrea*, 116 U.S. 671, 6 S.Ct. 557, 29 L.Ed. 764 (1886) (" 'No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.' "). Given that the contracts defined by Rahmani are a nullity under Virginia law, it follows that she cannot sue for rescission or restitution;[7] under Virginia law, she is simply left "in the plight in which [she has] seen fit to place [herself]." *Phillip Levy*, 80 S.E. at 792.

Nor does Virginia law afford Rahmani any statutory remedies for the losses she incurred at casino gambling tables in New Jersey. To be sure, Virginia's statutes reflect an unambiguous hostility to gambling. Thus, § 11–15 of the Virginia Code provides for the return of gambling losses sought within the three month statutory limit.[8] But § 11–15 cannot be applied to gambling losses that occur lawfully outside Virginia.[9] A state cannot invalidate the lawful statutes of another state or penalize activity that lawfully occurs in another state.[10] Put another way, the Virginia General Assembly has no power to invalidate lawful gambling taking place wholly outside of Virginia. *See, e.g., Edgar v. MITE Corp.*, 457 U.S. 624, 642–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (noting that the Commerce Clause preludes application of state statutes to commerce taking place wholly outside of the state's borders). Were this not so, absurd results would follow. If this statute could provide a basis for relief from a gaming contract entered into and fully performed in another state, then it would wreak havoc on the established—and legal—gambling industries across the country. Any gambling loser from Virginia could simply invoke § 11–15 and thereby absolve herself of any losses she suffered in Atlantic City, Las Vegas, or any other city where gambling is legal. Indeed, were § 11–15 to permit this, it would have the perverse effect of encouraging Virginians to gamble, albeit

(E.D.Va.1983), *aff'd*, 725 F.2d 676 (4th Cir.1984) (holding that note issued in payment of gambling loss was unenforceable as a matter of public policy).

**7.** It is a well settled principle that Virginia courts will not enforce a contract validly formed in another state if that contract would offend the public policy of Virginia; thus, a gambling contract that would be valid in the state where it was formed will not be enforced in Virginia. *See Hughes*, 465 S.E.2d at 827–28; *Resorts Int'l Hotel, Inc.*, 569 F.Supp. at 26; *Coghill v. Boardwalk Regency Corp.*, 240 Va. 230, 233, 396 S.E.2d 838, 839 (Va.1990). But this principle cannot be extended to support the proposition that Virginia would apply a foreign state's laws to recognize the validity of a contract legally formed in another state, thus providing a basis for suit, but would then apply its own law to undo that contract.

**8.** Under this section, "[a]ny person who shall, by playing at any game or betting on the sides or hands of such as play at any game, lose within twenty-four hours, the sum or value of five dollars, or more, and pay or deliver the same, or

any part thereof, may, within three months next following, recover from the winner, the money or the value of the goods so lost and paid or delivered, with costs of suit in civil action ...." Va.Code § 11–15.

**9.** Even if § 11–15 applied, recoupment of most if not all of Rahmani's losses would be barred by the statute's three month limitations period. Only losses occurring after November 11, 1997 would be timely.

**10.** *See Bigelow v. Virginia*, 421 U.S. 809, 822–25, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) ("A state does not acquire power or supervision over the internal affairs of another state merely because the welfare and health of its citizens may be affected when they travel to that state."); *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 1597, 134 L.Ed.2d 809 (1996) ("[A] state may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasor's lawful conduct in another state."); *see also Coghill*, 396 S.E.2d at 838 (enforcing under Full Faith and Credit Clause judgment validly obtained in another state that could not have been obtained in Virginia).

out-of-state. Therefore, even under Virginia law, Rahmani has neither a common law contractual basis nor a statutory basis for her claims for the return of her gambling losses.

For the foregoing reasons, Count I (rescission and restitution) and Count II (equitable accounting) must be dismissed.

## IV.

Rahmani also asserted a number of other claims. In Count III, Rahmani alleged that the defendants "negligently permitted and encouraged [her to] continue to gamble even though they knew, or should have known, that she was a compulsive gambler." Under Virginia's choice of law rules, tort claims are governed by the law of the place of the wrong. *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662, 663 (1979); *Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir.1986). The place of the wrong or injury is the place where the injury was suffered, not where the tortious act took place. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir.1986); 4A Michie's Jurisprudence, Conflict of Laws § 36. Here, the alleged injuries are gambling losses that occurred in New Jersey, and hence New Jersey law governs this tort claim.

Rahmani has adduced no New Jersey law to support her suggestion that Boardwalk and Resorts had a legal duty to stop her from gambling. To the contrary, there is New Jersey case authority suggesting that no such duty exists. *See Hakimoglu*, 876 F.Supp. at 625 (holding that casino has no legal duty to prevent intoxicated gambler from continuing to gamble). Nor is it arguable that such a duty is a "predictable extension of common law tort principles" under New Jersey law. *See Hakimoglu*, 876 F.Supp. at 633. Nothing in the CCA, which is manifestly comprehensive, suggests that the New Jersey legislature intended to create such a duty. *See id.; see also Miller v. Zoby*, 250 N.J.Super. 568, 595 A.2d 1104, 1110 (N.J.Super.Ct.App.Div.) (holding that breadth of issues covered under CCA precluded creation of tort cause of action for violation of the Act), *cert. denied*, 127 N.J. 553, 606 A.2d 366 (1991). Instead, the CCA specifically permits casinos to rely on individuals' propensity to gamble. *See Tose*, 819 F.Supp. at 1320 n. 11; N.J.S.A. 5:12–29. Accordingly, Count III must be dismissed.

Count V alleges that defendants harassed Rahmani "by persistently and continuously soliciting" her business. Rahmani does not provide any relevant authority holding that either New Jersey or Virginia recognizes such a tort.[11] Thus, this count must be dismissed.

Finally, in Count VI Rahmani alleges that Boardwalk violated two criminal fraud statutes, 18 U.S.C. §§ 1028 and 1546. These statutes do not provide for any private cause of action, and Rahmani suggests no basis for implying a private cause of action under these statutes. *See Suter v. Artist M.*, 503 U.S. 347, 363, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (burden on plaintiff to show that Congress intended to create a private remedy); *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (setting forth grounds for implying private cause of action under statutes). Accordingly, this count also must be dismissed.

Appropriate orders have issued.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

---

11. Virginia case law does not support the suggestion that such a cause of action exists in Virginia. But there is at least some New Jersey authority suggesting that such a cause of action might exist in New Jersey. *See Paternoster v. Shuster*, 296 N.J.Super. 544, 687 A.2d 330, 338 (N.J.Super.Ct.App.Div.1997) (allowing to proceed suit based on harassment cause of action derived from New Jersey criminal statute, N.J.S.A. 2C:33–4, but relying on intentional interference with prospective contractual relationship case law). That cause of action, however, would require the harassment be made with the purpose of harassing the recipient. *See id.; see* N.J.S.A. 2C:33–4. Defendants' conduct was undertaken not with the intent to harass Rahmani, but with the intent to induce her to travel to New Jersey to gamble.