IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

_____

No. 15-0821

_____

**FILED**

**June 15, 2016**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STACY STEVENS, Personal Representative
of the Estate of Scott Stevens, deceased,
Plaintiff Below, Petitioner

v.

MTR GAMING GROUP, INC.,
d/b/a Mountaineer Casino, Racetrack & Resort; and
INTERNATIONAL GAME TECHNOLOGY, INC.,
Defendants Below, Respondents

_____

Certified Questions from the United States District Court
for the Northern District of West Virginia

FIRST CERTIFIED QUESTION ANSWERED

_____

Submitted: April 20, 2016
Filed: June 15, 2016

James G. Bordas, Jr.
Laura P. Pollard
Sharon Y. Eubanks, *Pro Hac Vice*
Bordas & Bordas PLLC
Wheeling, West Virginia

Terry Noffsinger, *Pro Hac Vice*
Crossen Kooi LLP
Carmel, Indiana
Counsel for Petitioner

Robert J. D'Anniballe, Jr.
Pietragallo Gordon Alfano Bosick
& Raspanti, LLP
Weirton, West Virginia
Counsel for Respondent MTR Gaming
Group, Inc., d/b/a Mountaineer Casino,
Racetrack & Resort

John F. McCuskey
Brian J. Warner
J. Robert Russell
Shuman, McCuskey & Slicer, PLLC

Morgantown, West Virginia
Counsel for Respondent International
Game Technology, Inc.

JUSTICE BENJAMIN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.     "A de novo standard is applied by this court in addressing the legal issues presented by a certified question from a federal district or appellate court."  Syl. pt. 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998).

2.     The remedies provided by the Legislature to attenuate the social harm that can be occasioned by video lottery terminals, that is, the establishment of a fund and administrative scheme in West Virginia Code § 29-22A-19 to assist compulsive gamblers, together with the creation of an exclusion list in West Virginia Code of State Rules § 179-8-128.1.e whereby such persons may deprive themselves of the opportunity to gamble, are intended to be exclusive.

3.     No duty of care under West Virginia law exists on the part of manufacturers of video lottery terminals, or the casinos in which the terminals are located, to protect users from compulsively gambling.  Consequently, an action in negligence against the manufacturer or the casino may not be maintained for damages sustained by a user of the terminals as a result of his or her gambling.

Benjamin, Justice:

This proceeding arises upon our acceptance of certified questions from the United States District Court for the Northern District of West Virginia in connection with the underlying civil action filed by Stacy Stevens. Ms. Stevens is the personal representative of her late husband, Scott Stevens, and, in that capacity, she asserts a number of claims on behalf of his estate against defendants MTR Gaming Group, Inc., d/b/a Mountaineer Casino Racetrack & Resort ("MTR"), and International Game Technology, Inc. ("IGT").

## I. FACTUAL AND PROCEDURAL BACKGROUND

The district court certified potentially dispositive questions of West Virginia law to aid its analysis of the defendants' respective motions to dismiss, which have been premised on Rule 12(b)(6) of the Federal Rules of Civil Procedure. Hence, the material allegations of the complaint filed August 7, 2014, recited in the district court's order of certification and set forth below, have necessarily been taken as true. *See Hurley v. Allied Chem. Corp.*, 164 W. Va. 268, 269, 262 S.E.2d 757, 759 (1980).

Ms. Stevens alleges that her husband regularly patronized MTR's casino in Chester, West Virginia, from January 2007 until mid-August 2012, where he used video lottery terminals manufactured by IGT. She further alleges that, in the course of his patronage, Mr. Stevens developed a condition known as "gambling disorder," which is a

1

recognized medical diagnosis documented in the Diagnostic and Statistical Manual of

Mental Disorders ("DSM").[1]  Before he was found out and fired, Mr. Stevens, a corporate

executive, embezzled over $7 million from his employer to play the video lottery

---

[1] The DSM defines gambling disorder as "[p]ersistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress," pursuant to which the subject evidences at least four of the following diagnostic criteria in a twelve-month period:

1. Needs to gamble with increasing amounts of money in order to achieve the desired excitement.

2. Is restless or irritable when attempting to cut down or stop gambling.

3. Has made repeated unsuccessful efforts to control, cut back, or stop gambling.

4. Is often preoccupied with gambling (e.g., having persistent thoughts of reliving past gambling experiences, handicapping or planning the next venture, thinking of ways to get money with which to gamble).

5. Often gambles when feeling distressed (e.g., helpless, guilty, anxious, depressed).

6. After losing money gambling, often returns another day to get even ("chasing" ones' losses).

7. Lies to conceal the extent of involvement with gambling.

8. Has jeopardized or lost a significant relationship, job, or educational or career opportunity because of gambling.

9. Relies on others to provide money to relieve desperate financial situations caused by gambling.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 585 (5th ed. 2013).

machines. It is alleged that Mr. Stevens concealed his condition from his wife, and, that during the ten months following his termination, he spent his family's savings, his retirement account, and his children's college funds at the casino. On August 13, 2012, after gambling away the last of his money, Mr. Stevens sat down at a local park, phoned 911, and, when the police arrived, fatally shot himself.

According to the complaint, the software used in IGT's terminals employ algorithms and other features that deceptively cause gamblers to play longer, more quickly, and more intensely. The machines are allegedly designed to cause physiological change in brain functioning, which promotes the loss of willpower and curtails the capacity to make rational decisions. It is further contended that by their construction and programming, the machines erode the players' ability to walk away before they have exhausted their available funds. The casino is said to facilitate the compulsive behavior engendered by the machines by targeting affected patrons with marketing ploys such as offering complementary food and lodging, and by tendering lines of credit on terms that would not otherwise be bargained for.

Premised on the foregoing allegations, the complaint sets forth six claims by which Ms. Stevens maintains that the estate is entitled to compensatory and punitive damages. Count I contends that MTR breached its duty of care to Mr. Stevens by failing to deny him access to the casino in light of his psychological infirmities. Count IV more

or less recasts the Count I negligence allegations against both MTR and IGT in the context of a premises liability claim, wherein Mr. Stevens is asserted to have been a business invitee. Counts II and III, also naming both MTR and IGT, comprise products liability claims. In Count II, Ms. Stevens insists that the machines were defectively designed and not reasonably safe for their intended use, in part because they should have been programmed with available technology to permit players to lock themselves out after having expended a certain amount of time or money. Count III alleges that the defendants rendered the video terminals use defective by failing to adequately warn Mr. Stevens that the machines were inherently dangerous. Count V accuses MTR and IGT of intentionally inflicting emotional distress on Mr. Stevens, while Count VI seeks recovery from the defendants pursuant to the West Virginia Wrongful Death Act, W. Va. Code § 55-7-5, *et seq.*

MTR and IGT moved separately to dismiss the complaint for failing to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). At the conclusion of a hearing convened on May 11, 2015, the district court indicated its inclination to certify to this Court certain questions of law relevant to resolving the motions. After soliciting written suggestions from the parties as to how such questions should be formulated, the district court entered the subject order of certification on August 25, 2015, which was received in this Court on August 27, 2015. By Order

4

entered February 24, 2016, in consideration of the parties' submissions, we docketed for

oral argument the following three certified questions:

> 1. What duty of care exists as to each defendant given the allegation that the slot machines or video lottery terminals are designed through the use of mathematical programs and algorithms to create the illusion of chance while instead fostering a disassociated mental state, to protect casino patrons from becoming addicted to gambling by using these machines or terminals?
>
> 2. Are the gambling machines or terminals and specifically the software in them a "product" under West Virginia products liability law?
>
> 3. What legal duties, if any, arise under *Moats v. Preston County Commission*, 206 W. Va. 8, 521 S.E.2d 180 [1999], given that the suicide of Scott Stevens was a possible intervening cause?

## II.  STANDARD OF REVIEW

In accordance with the Uniform Certification of Questions of Law Act, W.

Va. Code § 51-1A-1 to § 51-1A-13, as adopted in West Virginia:

> The supreme court of appeals of West Virginia may answer a question of law certified to it by any court of the United States or by the highest appellate court or the intermediate appellate court of another state or of a tribe or of Canada, a Canadian province or territory, Mexico or a Mexican state, if the answer may be determinative of an issue in a pending cause in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state.

W. Va. Code § 51-1A-3 (1996).  "A de novo standard is applied by this court in

addressing the legal issues presented by a certified question from a federal district or

appellate court." Syl. pt. 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998); *accord* syl. pt. 1, *Bower v. Westinghouse Elec. Corp.*, 206 W. Va. 133, 522 S.E.2d 424 (1999) ("This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court.").

## III. ANALYSIS

The first certified question appropriately corresponds to "the threshold question in all actions in negligence[, which] is whether a duty was owed." *Strahin v. Cleavenger*, 216 W. Va. 175, 183, 603 S.E.2d 197, 205 (2004). In short, "[n]o action for negligence will lie without a duty broken." Syl. pt. 1, in part, *Parsley v. Gen. Motors Acceptance Corp.*, 167 W. Va. 866, 280 S.E.2d 703 (1981). Resolution of the first question before us thus depends on whether a cognizable legal duty may be identified as arising from the facts as alleged in the complaint. In aid of such identification, we have instructed as follows:

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

Syl. pt. 3, *Sewell v. Gregory*, 179 W. Va. 585, 371 S.E.2d 82 (1988).

Put another way, "one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to

another, is under a duty to exercise reasonable care to prevent the threatened harm." Syl. pt. 2, *Robertson v. LeMaster*, 171 W. Va. 607, 301 S.E.2d 563 (1983) (citing Restatement (Second) Torts § 321 (1965)). Importantly, however, "the existence of duty also involves policy considerations underlying the core issue of the scope of the legal system's protection." *Id.* at 612, 301 S.E.2d at 568 (citations omitted). We are therefore bound to evaluate such pertinent factors as "the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant." *Id.* (citations omitted).

Ms. Stevens asks that we employ unadorned reasoning to answer the first certified question in the affirmative. She contends quite simply that, by its repeated observance of Mr. Stevens, MTR was in a position to know that he had been seriously affected psychologically by using the video lottery terminals. Supported by the complaint's allegations that about one-half of those treated for gambling and associated disorders have suicidal ideations and about one-sixth actually attempt suicide, Ms. Stevens urges us to discern that MTR and IGT were duty-bound to intervene such that her husband would not suffer the foreseeable harm that ultimately ensued.

Relying on *Robertson* and our recognition therein that policy aims and goals must also be accounted for in the legal duty calculus, MTR seeks to expand the scope of our inquiry to consider the formidable burden of monitoring each casino patron

7

for the psychological signs of compulsive gambling. Without minimizing MTR's concerns in that regard, we choose to focus instead on its more substantial argument that the imposition of a legal duty to intervene with respect to those situated similarly to Mr. Stevens intrudes on the West Virginia Legislature's deliberate and detailed proclamation of public policy through its legalization and maintenance of casino gambling. IGT, in particular, emphasizes the heavily regulated nature of the industry, contending that such regulation and control manifests clear legislative intent to foreclose judicial interference with its essential operation.

The defendants' position finds considerable support in court decisions outside West Virginia, as no other jurisdiction has found a duty of care to exist under analogous circumstances. For example, in *Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120 (Ind. 2010), the casino sued its patron for writing $125,000 in dishonored checks during a single evening of gambling. The patron counterclaimed on the ground that the casino had enticed her with complimentary transportation, lodging, and the like though it knew she was a pathological gambler. The casino's motion to dismiss the counterclaim was denied, but, on interlocutory appeal, the Court of Appeals of Indiana overturned the trial court's ruling.[2] On review to the Supreme Court of

---

[2] *See Caesars Riverboat Casino, LLC v. Kephart*, 903 N.E.2d 117 (Ind. Ct. App. 2009).

Indiana, a majority of the justices agreed with the court of appeals and affirmed its decision. In so doing, the high court concluded that the Indiana legislature, through its comprehensive regulation of the state's riverboat gaming system, had effectively abrogated the common law. *See id.* at 1124.

Specifically, the *Kephart* court adverted to an Indiana regulation permitting compulsive gamblers to voluntarily place their names on a list excluding them from casino premises. The court reasoned that the creation of the voluntarily exclusion program evidenced legislative intent that persons at risk "take personal responsibility to . . . protect themselves." 934 S.E.2d at 1124. Imposing a duty to exclude where the legislature has declined to do so would, according to the court, "shift primary responsibility from the gambler to casino. It is apparent that the legislature intended otherwise." *Id.* Under those circumstances, "allowing a common law negligence claim addressing behavior essentially the same as prohibited under the statutory scheme irreconcilably conflicts with the intent of the legislature." *Id.*[3]

---

[3] In *Merrill v. Trump Indiana, Inc.*, 320 F.3d 729 (7th Cir. 2003), the federal court of appeals concluded that, although the plaintiff had placed himself on the Indiana voluntary exclusion list, no duty of care arose on the part of the defendant casino to ensure that he would be actually excluded. The court observed that the casino's "obligation to follow regulations promulgated by the Indiana Gaming Commission does not automatically translate into a duty of care owed to compulsive gamblers. At most, the rules impose upon [casinos] a duty to the state through the gaming commission, not to a self-requesting evictee." *Id.* at 732; *accord Stulajter v. Harrah's Indiana Corp.*, 808

(continued . . .)

A similar result obtained in *Taveras v. Resorts International Hotel, Inc.*, No. 07-4555, 2008 WL 4372791 (D.N.J. Sept. 19, 2008) (unpublished), wherein the district court was tasked with predicting whether the New Jersey courts would impose a duty of care upon casinos to identify and exclude compulsive gamblers. The plaintiff in *Taveras* was a lawyer who had lost substantial sums of money in various Atlantic City casinos over a fourteen-month period, including $150,000 in a single weekend, gambling away client funds to fuel her addiction. The plaintiff alleged that casino employees permitted her to gamble notwithstanding that they had been informed of her condition, even refusing to permit family members to take her home. Indeed, the casinos encouraged the plaintiff to continue gambling by offering her prize incentives and free transportation, food, lodging, and entertainment.

The district court rejected the plaintiff's contention that New Jersey would recognize a duty of care on the part of the casinos under those circumstances, concluding that the state had made a "deliberate decision not to impose such a duty." *Taveras*, 2008 WL 4372791 at *4. In support of its ruling dismissing the plaintiff's complaint, the court recited that "statutory and administrative controls over casino operations are extraordinary, pervasive and intensive. State law regulates virtually every facet of casino

N.E.2d 746 (Ind. Ct. App. 2004) (noting agreement with *Merrill* and affirming dismissal of plaintiff's complaint based on casino's failure to observe voluntary exclusion list).

10

gambling and its potential impact upon the public. The regulatory scheme is both comprehensive and minutely elaborate." *Id.* (quoting *Knight v. City of Margate*, 431 A.2d 833 (N.J. 1981) (alterations and ellipses omitted)). In spite of the extensive and thorough regulation, the court noted, the asserted duty of care was conspicuously absent therefrom, evidencing conclusively that no such duty existed. The court expressed a broader concern that, moreover, the imposition of such a duty "would, in effect, have no limit. For example . . . her theory would impose a duty on shopping malls and credit-card companies to identify and exclude compulsive shoppers." *Id.*; *accord Logan v. Ameristar Casino Council Bluffs, Inc.*, 185 F. Supp. 2d 1021 (S.D. Iowa 2002) (dismissing negligence claim on ground that "the Iowa Supreme Court has never recognized a common law duty" to prevent patrons from compulsively gambling).[4]

As has been made evident in New Jersey and Indiana, casino gambling in West Virginia at the State's four pari-mutuel racetracks is meticulously and pervasively regulated. The primary statutory authorization for video lottery terminals, such as those

---

[4] *Taveras* was reasoned similarly to Judge Alito's opinion for the court of appeals in *Hakimoglu v. Trump Taj Mahal Associates*, 70 F.3d 291 (3d Cir. 1995). The court in *Hakimoglu* predicted that New Jersey would impose no common-law duty on casinos to prevent intoxicated patrons from continuing to gamble. *Cf. Rahmani v. Resorts Int'l Hotel, Inc.*, 20 F. Supp. 2d 932 (E.D. Va. 1998) (acceptance of inducements by Virginia citizen to travel to and gamble in Atlantic City casinos did not give rise to voidable contracts under New Jersey law given exhaustive regulatory scheme and specific authorization of gambling junkets).

11

used by Mr. Stevens at MTR's facility, is the West Virginia Racetrack Video Lottery Act, W. Va. Code § 29-22A-1, *et seq.*, whereas other traditional casino offerings are subject to the provisions of, *inter alia*, the West Virginia Lottery Racetrack Table Games Act, W. Va. Code § 29-22C-1, *et seq.*[5] With respect to the enactment of the former, the Legislature specifically found that "pari-mutuel racing facilities in West Virginia provide a valuable tourism resource . . . and . . . significant economic benefits . . . through the provision of jobs and the generation of state revenues," and that the survival of the industry was threatened "unless modern lottery games are authorized at the racetracks." W. Va. Code § 29-22A-2(e) (1994).

The machines themselves must be approved by the West Virginia Lottery Commission (the "Commission"). *See* W. Va. Code § 29-22A-5(b) (1994). Indeed, the fundamental term "video lottery game" is statutorily defined as "a *commission approved, owned and controlled* electronically simulated game of chance which is displayed on a video lottery terminal." *Id.* § 29-22A-3(y) (2013) (emphasis added). The State owns and operates the video lottery, and, in facilitation thereof, it

---

[5] In addition to the four racetracks, video lottery terminals and table games are permitted in West Virginia at "one well-established historic resort hotel," more precisely identified as The Greenbrier. W. Va. Code § 29-25-1 (2009). Denominated a "limited gaming facility," casino gambling at The Greenbrier is separately governed by the provisions of West Virginia Code § 29-25-1, *et seq.*, supplemented by the legislative rule set forth at 179 C.S.R. 4 (2010).

may acquire a proprietary interest in video lottery game software . . . through outright ownership or through an exclusive product license agreement with a manufacturer whereby the manufacturer retains copyrighted ownership of the software but the license granted to the state is nontransferable and authorizes the state to run the software program, solely for its own use, *on the state's central equipment unit and electronic video terminals* networked to the central equipment unit.

*Id.* § 29-22A-2(b) (1994) (emphasis added).

In approving the terminals, the Commission "shall take into account advancements in computer technology, competition from nearby states and the preservation of jobs in the West Virginia pari-mutuel racing industry." W. Va. Code § 29-22A-6(a) (2011). Moreover, the hardware and software components of the machines are required to precisely comport with statutory parameters, and "[e]ach video lottery terminal approved for placement at a licensed racetrack must conform to the exact specifications of the video lottery terminal prototype tested and approved by the commission." *Id.* § 29-22A-5(f) (1994); *see id.* § 29-22A-9(b)(1) (1998) (mandating the "manufacture [of] terminals and associated equipment for placement in this state in accordance with the specifications and procedures . . . in sections five and six of this article"). The machines "shall pay out no less than eighty percent and no more than ninety-five percent of the amount wagered." *Id.* § 29-22A-6(c)(1). Each terminal must "[a]llow[] a player at any time to simultaneously clear all game play credits and print a

13

redemption ticket entitling the player to receive the cash value of the free plays cleared." *Id.* § 29-22A-3(y)(5).

The Racetrack Video Lottery Act further governs the qualifications and responsibilities of licensees and permit holders, details the duties of manufacturers and other key parties, and provides for the comprehensive reporting and accounting of machine proceeds. As a general matter, the net income from the machines is divided among the casino, the Commission, various State funds, the county in which the casino is located, and county municipalities. *See id.* § 29-22A-10 (2011). Of particular significance, between $150,000 and $500,000 annually is earmarked for the "Compulsive Gambling Treatment Fund," by virtue of which the West Virginia Department of Health and Human Resources is empowered to contract for and administer a treatment program for compulsive gamblers. *See id.* § 29-22A-19 (2008).[6]

By legislative rule promulgated under the authority of the Racetrack Table Games Act, *see* W. Va. Code § 29-22C-4(b)(5) (2007), the State has directed the establishment and maintenance of a list, similar to those in other jurisdictions, whereby patrons may be excluded from the casino premises. Under most circumstances,

---

[6] The fund receives an additional $150,000 to $1 million per year from "limited video lottery" proceeds generated by terminals located in non-casino venues throughout West Virginia. *See* W. Va. Code § 29-22B-1408(a)(1) (2006).

placement on the exclusion list is involuntary; however, a person who "has realized that he or she has a compulsive gaming disorder" may "request[] in writing to be excluded from the casino and/or all of the state's four pari-mutuel racetracks." W. Va. Code R. § 179-8-128.1.e (2008).

Based upon our review of West Virginia's statutory and regulatory scheme governing video lottery terminals at the State's racetracks, several conclusions may be drawn. First, such machines exist in West Virginia for the express purpose of providing an economic boon to the State and its political subdivisions in the form of increased public revenues, to the citizenry in the form of enhanced employment opportunities, and to the racetrack industry for the additional benefit of the dependent local economies. Second, the State has so thoroughly integrated itself into the provision and operation of the machines on every level, in both a macro and a micro sense, that its involvement cannot readily be divorced from that of its licensees and key suppliers. Third, the State has plainly weighed the societal costs of the machines—specifically including their contribution to compulsive gambling and the potential consequences thereof—against their economic benefits, and it has nonetheless elected to make them available to the public. From the first three conclusions, we may distill a fourth: that the remedies provided by the Legislature to attenuate the social harm that can be occasioned by video lottery terminals, that is, the establishment of a fund and administrative scheme in West Virginia Code § 29-22A-19 to assist compulsive gamblers, together with the creation of

15

an exclusion list in West Virginia Code of State Rules § 179-8-128.1.e whereby such persons may deprive themselves of the opportunity to gamble, are intended to be exclusive.

The efficacy of the legislatively prescribed remedies may fairly be subject to debate, and their availability certainly did not prevent Mr. Stevens's suicide. Nonetheless, it has always been the province of the Legislature to decide the public policy of this State, and it is as true now as ever that

> "[w]ith the wisdom or propriety of the act we have nothing to do. Those are matters for the Legislature alone to consider; it determines the public policy. Our jurisdiction ends when we have determined the legislative power to exist. If the Legislature has made a mistake, it is a political one, and it alone can correct it."

*Leonhart v. Bd. of Educ. of Charleston Ind. Sch. Dist.*, 114 W. Va. 9, 16, 170 S.E. 418, 421 (1933) (quoting *Booten v. Pinson*, 77 W. Va. 412, 428, 89 S.E. 985, 992 (1915)); *see State ex rel. Key v. Bond*, 94 W. Va. 255, 270, 118 S.E. 276, 283 ("The Legislature declares public policy, not the courts."). Finding ourselves in agreement with those decisions applying Indiana and New Jersey law under similar circumstances, we echo the observation of the court in the former that "the statutory scheme and [the plaintiff's] common law claim are so incompatible that they cannot both occupy the same space." *Kephart*, 934 N.E.2d at 1124.

We therefore answer the first certified question in the negative. We hold that no duty of care under West Virginia law exists on the part of manufacturers of video lottery terminals, or the casinos in which the terminals are located, to protect users from compulsively gambling. Consequently, an action in negligence against the manufacturer or the casino may not be maintained for damages sustained by a user of the terminals as a result of his or her gambling.

We decline to answer the second and third certified questions, because they are mooted by our answer to the first certified question. *See* syl. pt. 7, *Shell v. Metro. Life Ins. Co.*, 181 W. Va. 16, 380 S.E.2d 183 (1989) ("'In a certified case, this Court will not answer certified questions not necessary to a decision of the case.'" (quoting syl. pt. 6, *W. Va. Water Serv. Co. v. Cunningham*, 143 W. Va. 1, 98 S.E.2d 891 (1957))). To elaborate, the lack of a duty of care is not determinative of a strict liability claim, whose viability depends on "whether the involved product is defective in the sense that it is not reasonably safe for its intended use." Syl. pt. 4, in part, *Morningstar v. Black & Decker Mfg. Co.*, 162 W. Va. 857, 253 S.E.2d 666 (1979).

Here, though, we are being asked by the district court to decide whether a video lottery terminal and the software on which it operates is a "product" that may support a strict liability theory. Regardless of whether the terminals are products, however, no claim will lie if they are not defective. From our discussion of the first

17

certified question, it is beyond dispute that the publicly owned terminals are designed, built, and operated according to the State's exacting specifications. So long as the machines and their software operate as the State intends, consistent with their design, no defect exists as a matter of law and neither the manufacturer nor the casino may be held liable for a claim sounding in strict liability. *Cf. Sayre v. Stevens Excavating Co.*, 163 W. Va. 324, 328–29, 256 S.E.2d 571, 574 (1979) (holding that private contractor "operating within the boundaries described in the plans and specifications furnished it" by a State agency is "entitled to the immunity of the state") (citing syl. pt. 2, *Bailey v. S. J. Groves & Sons Co.*, 159 W. Va. 864, 230 S.E.2d 267 (1976)).

The mootness of the third certified question is more straightforward. In *Moats*, *supra*, we acknowledged that, absent a special relationship between the parties giving rise to a specific duty to prevent the decedent's suicide, the act of taking one's own life is generally regarded as a supervening act that breaks the chain of causation necessary to hold a defendant liable for the plaintiff's wrongful death. *See* 206 W. Va. at 16–17, 521 S.E.2d at 188–89. We need not opine as to the effect of Mr. Stevens's suicide on his estate's wrongful death claim; the Legislature's determination that no duty of care is owed generally to compulsive gamblers precludes the possibility here that a more specific, special relationship may exist regarding such persons whereby the issue of causation must be considered.

18

## IV. CONCLUSION

Pursuant to the foregoing, we answer the first certified question in the negative, and we decline to answer, as effectively moot, the second and third certified questions.

First Certified Question Answered.

19